# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1852V

| | |
|---|---|
| STACEY HURLEY,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: March 4, 2024 |

*Laura Levenberg*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Madelyn Weeks*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On December 14, 2020, Stacey Hurley filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 10, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to compensation. Furthermore, I award of damages in the amount of **$60,000.00 for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I. **Relevant Procedural History**

This case was activated on February 2, 2021 (ECF No. 8), and later assigned to SPU. On March 30, 2022, Respondent filed a status report stating that he was amenable to informal resolution, and the parties attempted negotiations (ECF Nos. 26-27).[3] However, they soon reached an impasse (ECF No. 28). Respondent filed his report on September 13, 2022 (ECF No. 30).

On January 31, 2023, Petitioner filed a motion for a ruling on the record requesting a finding that she received the flu vaccine in her right arm, suffered residual effects of her injury for more than six months, and has satisfied all other requirements for entitlement to compensation, and requesting damages for pain and suffering (ECF No. 31). Respondent filed a response to the motion on February 28, 2023, and Petitioner replied on March 9, 2023 (ECF Nos. 32, 33). On February 16, 2024, Petitioner filed a joint status report confirming that Petitioner seeks damages for pain and suffering only (ECF No. 35). The matters of whether Petitioner is entitled to compensation and, if so, how much, are now ripe for consideration.

II. **Factual Evidence**

Although I have reviewed the entire record, this decision summarizes only evidence relevant to the situs of vaccine administration, the statutory severity requirement, Petitioner's entitlement to damages, and the amount of damages.

A. **Medical Records**

Petitioner received an intramuscular flu vaccine on October 10, 2019. Ex. 1 at 1. The relevant record states that the vaccine was administered in her left deltoid, although it is Petitioner's position that this was incorrectly recorded.

Eleven days later (October 21, 2019), Petitioner was seen by nurse practitioner ("NP") Jung Kim at ChristianaCare Employee Health Services, complaining of "right shoulder pain after" flu shot. Ex. 4 at 3. At rest she did not have pain, but with certain motions she reported pain at a level of eight out of ten. *Id.* On examination, she had no palpable tenderness on her right deltoid area, no swelling or bruises, and her range of motion ("ROM") was intact. *Id.* She was assessed with pain of her right upper arm and advised to do gentle stretches and use warm compresses and non-steroidal anti-inflammatory drugs ("NSAIDs"). *Id.*

Petitioner returned to ChristianaCare Employee Health a week later (October 28, 2019) and saw NP Jason Painter. Ex. 4 at 5. She stated that on October 10th during the "flu blitz," she received a flu vaccine that was administered above her deltoid muscle, and

---

[3] Previously, Respondent had stated that he opposed compensation (ECF No. 25).

2

she had pain in her right shoulder since that time. *Id*. She reported "significant right shoulder pain w/ROM movements" as well as increased tenderness with motion. *Id*. She was taking Motrin as needed. *Id*. On examination, ROM movements caused increased pain and were noted as slow. *Id*. She was assessed with right shoulder bursitis and physical therapy ("PT") was recommended. *Id*. She did not request a work restriction, stating it was not necessary in light of her job requirements. *Id*.

Three days later, on October 31, 2019, Petitioner underwent a PT evaluation for right shoulder pain. Ex. 5 at 62. She now reported that she had received a flu shot that was given "really high" on October 10, 2019. *Id*. She identified her right shoulder as being the location of the pain, and in response to a question about how the injury occurred stated "flu shot was injected into tendon not deltoid." *Id*. at 61. The first three to four days were "really bad," and she had difficulty sleeping, requiring Motrin to sleep through the night. *Id*. at 62. It had now been three weeks and she was still having pain. *Id*. She had difficulty washing her back and fastening her bra behind her back, and complained of throbbing in her shoulder. *Id*. She reported pain ranging between three and eight or nine out of ten. *Id*. at 61, 62. The last time she had taken Motrin was the day before, and her shoulder was feeling "a little better" today. *Id*. She had stopped exercising for the past two weeks. *Id*. at 62.

On examination, Petitioner's right shoulder active ROM was 150 degrees in flexion (compared to 160 degrees on the left) and 110 degrees in abduction (compared to 140 on the left). Her right shoulder passive ROM was 65 degrees in external rotation, compared to 85 degrees on the left. Ex. 5 at 64. Her right shoulder had positive results on the empty can test and reduced strength compared to the left shoulder. *Id*. She was noted to have reduced right shoulder active ROM and decreased passive ROM in external rotation, decreased strength, and pain/difficulty with activities. *Id*. A treatment plan of two to three sessions for three to four weeks was established. *Id*. at 65. Petitioner attended a total of 11 PT sessions, the last on November 27, 2019. Ex. 5 at 61-110.

Petitioner followed up with NP Painter of ChristianaCare Employee Health on November 13, 2019. Ex. 4 at 7. She was seen for an alleged injury to her right shoulder following a flu vaccine approximately a month prior during the "flu blitz." *Id*. She had been doing PT and taking NSAIDs without improvement, and continued to have "significant right shoulder pain which is causing her difficulty w/performing ROM movements." *Id*. NP Painter noted that she likely had right shoulder bursitis, although it had not responded to NSAID use and PT. *Id*. He ordered a Medrol dose pack and continued PT, noting that if she did not show improvement, she should see an orthopedist. *Id*.

Petitioner returned to see NP Painter six days later (November 19, 2019), reporting little to no improvement with PT and the Medrol dose pack. Ex. 4 at 9. Because she had failed to respond to ibuprofen, Medrol dose pack, and PT, she was referred to an orthopedist. *Id*.

A week later (November 26, 2019), Petitioner saw orthopedist Dr. Brian Galinat for aching and dull right shoulder pain. Ex. 6 at 6. She reported that the onset of her pain was sudden and occurred at work on October 10th from a flu shot injected "on top of" her right shoulder. *Id.* at 6, 28. Her symptoms were aggravated by daily activities, lifting overhead, lying in bed, motion, sleeping, twisting, and work activities. *Id.* Her symptoms were relieved by heat, ice, NSAIDs, Tylenol, PT, and rest. *Id.* On examination, she had normal pain-free active ROM in both shoulders, but her right shoulder passive ROM was restricted due to pain. *Id.* at 7. She had negative results on the Neer, Hawkins, Yergason's, Speed's, empty can, and drop arm tests on both shoulders. *Id.* at 7-8.

Petitioner was assessed with pain and adhesive capsulitis of her right shoulder. Ex. 6 at 8. Dr. Galinat noted that Petitioner related her ROM restriction "to a flu shot received at work on October 10." *Id.* He advised her to switch to a home exercise program focused on stretching and start Celebrex. *Id.* On an intake form dated November 26, 2019, Petitioner reported right shoulder pain that began on October 10, 2019 at work from "flu shot injected on top of R shoulder." *Id.* at 9. She rated her pain as eight out of ten. *Id.*

Petitioner saw Dr. Galinat again on January 6, 2020, for sharp, aching shoulder pain, and stated she felt worse since her last visit in November. Ex. 6 at 10. Her right shoulder passive ROM was restricted due to pain. *Id.* at 12. She rated her pain as eight out of ten. *Id.* at 14. Dr. Galinat administered a steroid injection and advised Petitioner to continue frequent, gentle stretching exercises. *Id.* at 13.

Petitioner returned to NP Painter on January 24, 2020. Ex. 4 at 11. She had finished PT but continued to do home exercises. *Id.* She had received a steroid injection from the orthopedist on January 6th, with little to no improvement. *Id.* NP Painter recommended that she continue care with the orthopedist. *Id.*

On February 17, 2020, Petitioner saw Dr. Galinat again. Ex. 6 at 21. She complained of sharp, throbbing pain in her right shoulder that occurred during activities, sleep, and intermittently. *Id.* She reported feeling "about 50% better" since her last visit on January 6th, although she again rated her pain as eight out of ten. *Id.* at 21, 23. She continued to have restrictions in her ROM "consistent with post injection adhesive capsulitis" that was resolving. *Id.* at 22. Dr. Galinat expected her to see continued improvement. *Id.* Petitioner also returned to NP Painter on February 26, 2020. Ex. 4 at 13. Her symptoms were slowly starting to improve. *Id.* She was advised to continue care with the orthopedist. *Id.*

On April 9, 2020, Petitioner had a phone visit with NP Painter. Ex. 4 at 16. She had completed PT and continued to do home exercises. *Id.* Her right shoulder pain was slowly improving, and she "only notice[d] significant right shoulder pain with certain movements." *Id.* She mostly experienced severe pain when pulling in her right shoulder behind her back. *Id.* She had recently seen her orthopedist and been discharged from his care. *Id.*

4

NP Painter recommended that she continue home exercises and contact employee health in four weeks for re-evaluation. *Id.*

Petitioner saw her primary care physician Dr. Bipasha Mitra for an annual physical on June 12, 2020. Ex. 3 at 9. She was feeling well with no complaints. *Id.* The record is negative for joint or muscle pain. *Id.* at 10. On examination, her right upper extremity had normal strength and tone, and no abnormalities were noted. *Id.* at 11. There is no mention of right shoulder pain or symptoms.

### B. Affidavit and Declaration

Petitioner filed three affidavits and declarations in support of her claim. Exs. 2, 7, 9. She explains that she received the October 10, 2019 vaccine in her right shoulder at a ChristianaCare "flu blitz" event. Ex. 7 at ¶ 2. She is right handed, and had the shot in her right arm because she had a left-sided mastectomy in July 2016. *Id.* at ¶ 3. The "flu blitz" is a one day event where the hospital tries to vaccinate as many staff as possible, and was held in the auditorium with multiple vaccination stations. *Id.* at ¶ 4. Each station had a vaccinator and a clerical support person. *Id.* at ¶ 5. The clerical support person, rather than the person who administered the vaccine, was responsible for entering into the computer which arm was vaccinated. *Id.* This was the first year that clerks entered the vaccine information; in previous years, the vaccinator filled out a paper form with their initials and the vaccination site. *Id.* at ¶ 8.

When Petitioner returned to her desk after receiving the flu vaccine, she received an automated email confirming her vaccination. Ex. 7 at ¶ 6. She immediately noticed that the wrong arm had been documented on the form. *Id.* She was already annoyed that the injection had been administered too high and did not concern herself with the documentation error at first, not anticipating any problems from it. *Id.* However, in November 2019, she contacted the unit that ran the "flu blitz" to request correction of the error. *Id.* She never received a response to her email. *Id.*

Petitioner states that she continued to have shoulder pain after her April 2020 appointment with employee health. Ex. 9 at ¶ 4. She told NP Painter that she hoped for continued improvement; although he was sympathetic, he did not have anything to add. *Id.* At the end of the visit, he said she could check back in a month or so. *Id.* When she did check in the following month, she did not receive an answer. *Id.* at ¶ 5. Petitioner also tried to make an appointment by phone, but the person who answered the Employee Health phone was adamant that they do not provide treatment, only follow up. *Id.* at ¶ 6. Because she had not recently seen a provider, there was nothing to follow up on. *Id.* At that point, she stopped contacting Employee Health. *Id.*

At Petitioner's annual physical in June 2020, she told Dr. Mitra about her shoulder injury and that her orthopedist had discharged her although she was still having pain. Ex. 9 at ¶ 7. Dr. Mitra was not surprised, explaining that because Petitioner did not need

surgery, there was nothing more the orthopedist could do. *Id.* Dr. Mitra told her that her shoulder probably would not get any better, and may always hurt. *Id.*

Petitioner stated, in an affidavit signed October 25, 2021, that she still experiences pain in her right shoulder. Ex. 9 at ¶ 9. It has improved, but she has also modified how she does things to accommodate her injury, including using five pillows for positioning while sleeping, and putting her bra on backwards to avoid pain. *Id.* She uses a back brush for showering because she cannot reach her back like she used to, and keeps her right arm close to her body when lifting. *Id.* She has shoulder pain in the morning if she sleeps on her right side for too long. *Id.* at ¶ 10. Things like plank exercises, reaching to grab a dish off a shelf, sudden twisting of her arm, or reaching behind her cause pain in the moment that subsides when she stops. *Id.*

### C. Other Evidence

The record contains a November 18, 2019 email from Petitioner to two other ChristianaCare employees about her flu vaccine. Ex. 8 at 2. In it, Petitioner stated:

> *There was an error when the nurse documented my flu vax.*
> *My injection was in my Right arm.*
> *Is there anything to do to correct this error? I don't know if there will be problems with the workman's comp claims if the documentation is incorrect.*

Ex. 8 at 2. The record does not contain any response to this email message.

The record further contains a document titled "Workplace Injury Event" dated October 28, 2019. Ex. 10 at 1. The form states that Petitioner "[r]eceived flu vaccine on 10/10/19 at flu blitz. injection was given high on top of the right shoulder and not into the deltoid. experienced severe shoulder pain and limited range of motion." *Id.* And Petitioner has filed a May 14, 2020 email from Petitioner to NP Painter. Ex. 11 at 1. In the email, Petitioner stated that her department was still working from home, and inquired whether employee health was doing virtual visits.[4] *Id.* Petitioner inquired whether NP Painter wanted to make an appointment for an update, or call her. *Id.* There is no record of a response to this message.

### III. Factual Findings and Ruling on Entitlement

#### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section

---

[4] This was in the months after the World Health Organization declared COVID-19 a pandemic, the United States declared a nationwide emergency, and many states issued stay at home orders. *See* https://www.cdc.gov/museum/timeline/covid19.html (last visited Mar. 4, 2024).

13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[5]  a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

---

[5] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments

Petitioner argues that although the administration record states that the vaccine was administered in her left shoulder, the document is in error. Petitioner's Motion for a Ruling on the Record, filed Jan. 31, 2023, at *6-7 (ECF No. 31) ("Mot."). She noticed the error when she returned to her desk after vaccination and attempted to have the vaccination situs amended the month after vaccination. Mot. at *7. She promptly sought treatment 11 days after vaccination, and at that time and consistently thereafter she related her *right* shoulder pain to vaccination. *Id.* at *6-7. The sole mention of the vaccine being administered in her left shoulder is a computer printout completed during a "flu blitz" at her workplace that was intended to vaccinate as many people as possible, raising the possibility that some details – such as situs of vaccine administration - were overlooked to make the process quicker. *Id.* Petitioner also states that the clerk who entered information about the vaccination into the computer was not the person who administered the vaccine, and that vaccine administration records do not warrant the same presumption of accuracy that other medical records are given. *Id.* In Petitioner's view, "the evidence is overwhelmingly in favor of the right shoulder being the vaccination site," and to accept that the vaccine was administered in Petitioner's left shoulder would require disregarding all records other than the computerized vaccination record. *Id.* at *7.

Petitioner argues that the remaining SIRVA requirements are met in that she has no history of shoulder pain or injuries or other conditions or abnormalities that would explain her symptoms. Mot. at *8-9. The onset of her shoulder pain occurred within 48 hours of vaccination, and her pain was limited to her right shoulder. *Id.* at *8.

9

Petitioner further asserts that she suffered the residual effects of her injury for more than six months, noting that her April 9, 2020 visit, at which she reported that her pain was improving but she still noticed severe right shoulder pain with certain movements, was "*one day short* of 6 months post vaccine administration." Mot. at *9 (emphasis added). At this visit, she was advised to continue home exercises and contact Employee Health in four weeks – which she did, without response. *Id*. Petitioner argues that "[i]t is extremely improbable, if not impossible, that her symptoms would have totally resolved less than 24 hours after this appointment where she still had complaints of occasional severe pain." *Id*. at *11.

Respondent argues that Petitioner has not established that she suffered from a right-sided SIRVA because her vaccination record documents that she was vaccinated in her left arm. Respondent's Response, filed Feb. 28, 2023, at *8 (ECF No. 32) ("Resp."). Although Petitioner requested that the vaccination record be corrected, she has not submitted a revised record. *Id*. Respondent acknowledges that Petitioner submitted an affidavit in support of her claim, but argues that the Vaccine Act does not permit a finding of entitlement based on Petitioner's claims alone, unsubstantiated by medical records or medical opinion. *Id.* Thus, in Respondent's view, Petitioner has not demonstrated by preponderant evidence that the flu vaccine was administered in her right arm. *Id.* Otherwise, Respondent asserts that the statutory severity requirement is not met because "her shoulder complaints were largely resolved within six months of her October 10, 2019 vaccination." *Id*. at *9. After April 9, 2020, she did not follow up with her orthopedist of complain of shoulder pain or dysfunction during visits with her PCP. *Id*.

Petitioner replies that the objective evidence shows that she was still experiencing pain that was at times significant on April 9, 2020 – one day short of six months. Petitioner's Reply, filed March 9, 2023, at *1-2 (ECF No. 33) ("Reply"). She was advised to continue home exercises and return in four weeks, and followed this plan (although she did not receive a response to her request for a follow-up). Reply at *2. As such, Petitioner argues that she has met the severity requirement. *Id*.

### C. Situs of Vaccine Administration

Preponderant evidence supports a finding that Petitioner's October 10, 2019 flu vaccine was administered in her right shoulder. Only the vaccine administration record documents the situs as her left shoulder - all other records point to a finding that the flu vaccine was administered in Petitioner's right shoulder. Thus, even if the administration record deserves some weight (solely because it came first), it lacks subsequent corroboration.

By contrast, the weight of the remaining evidence favors Petitioner's argument. Petitioner sought care promptly, only 11 days after vaccination, complaining of right shoulder pain from a flu shot. Ex. 4 at 3. In seeking care, she consistently related her right shoulder pain to the October 10th flu shot. Exs. 4 at 5-7; 5 at 61-65; 6 at 6-9. And

Petitioner provided affidavit testimony that the flu shot was administered in her right shoulder, along with a compelling explanation for why she recalls having the shot in her right shoulder: a left-sided mastectomy three years prior. Ex. 7 at ¶ 3. Petitioner also provided an email she sent just over a month after vaccination stating that the flu shot was administered in her right arm. Ex. 8 at 2. She later filed a workplace injury form a month and a half after vaccination stating that the October 10th flu vaccine "was given high on top of the right shoulder." Ex. 10 at 1.

The sole piece of evidence suggesting that the vaccine was administered in Petitioner's left arm is a vaccine record that was completed by someone other than the vaccine administrator. Ex. 7 at ¶ 5. This is not sufficient to outweigh the evidence that would support a finding that the vaccine was administered in her right shoulder.

### D. SIRVA QAI Criteria

Respondent does not contest any of the SIRVA QAI criteria, and I find that the record contains preponderant evidence that they are satisfied. Petitioner did not have a history of right arm pain or injury prior to vaccination that would explain her symptoms after vaccination. Ex. 3. The onset of her shoulder pain occurred within 48 hours of vaccination. Exs. 4 at 3-7; 5 at 61-62; 6 at 6-9. Her pain and reduced ROM were limited to her right. shoulder, where the flu vaccine was administered, and no other condition or abnormality has been identified that would explain her post-vaccination symptoms. Exs. 5, 6.

### E. Severity Requirement

In addition, the evidence preponderantly supports a finding that Petitioner has met the statutory severity requirement by demonstrating that she suffered residual effects of her injury for more than six months. The last treatment record for Petitioner's shoulder injury is from April 9, 2020 – *one day short* of six months. Ex. 4 at 15. At that visit, she reported that her shoulder pain was slowly improving – not that it was gone. *Id*. She reported "significant right shoulder pain with certain movements," particularly when pulling in her right shoulder behind her back. *Id*. Her medical provider recommended that she continue home exercises and report back in four weeks – which she did. *Id*.

In order to find that Petitioner did not suffer the residual effects of her condition for more than six months, I would have to find that the residual effects noted above disappeared within a day or two of the April 9th visit. There is no evidence that this is the case, and I find that more likely than not, these residual effects did not stop within that time, but persisted. *See Purtill v. Sec'y of Health & Human Servs.*, No. 18-0832V, 2019 WL 7212162, at *6 (Fed. Cl. Spec. Mstr. Nov. 12, 2019) (finding it more likely than not that "a shoulder injury that was still causing occasional pain after five months and twenty-three days . . . would not fully resolve within the following week"); *see also Rowe v. Sec'y of Health & Human Servs.*, No. 17-1182V, 2020 WL 6281742, at *4 (Fed. Cl. Spec. Mstr. Sept. 24, 2020) ("It is simply more likely than not that a shoulder injury that was still

11

causing moderate pain after five months and 9 days . . . and which was deemed worthy of additional treatment (in the form of NSAIDS and physical therapy) would not have fully resolved within the next three weeks"). Therefore, I find that it is more likely than not that Petitioner suffered the residual effects of her injury for more than six months.

### F. Other Requirements for Entitlement

The record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 1. She states that neither she, nor any other party, has ever received an award or settlement for her vaccine-related injury or filed a civil action. Ex. 2.

### G. Entitlement

I find that Petitioner has established by a preponderance of the evidence that all of the Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## IV. Damages

### A. Legal Standards

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections V and VI of *Parsons v. Sec'y of Health & Human Servs.*, No. 19-1150V, 2023 WL 9060490, at *7-9 (Fed. Cl. Spec. Mstr. Nov. 30, 2023).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

### B. Parties' Arguments

Petitioner proposes a pain and suffering award of $68,000.00, citing *Russo*, *Johnson*, *Dagen*, and *Knauss*, featuring pain and suffering awards of $63,000.00,

---

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

12

$65,000.00, and $65,000.00, and $60,000.00, respectively.[7] Respondent maintains that Petitioner is not entitled to compensation, but if I find she did suffer a SIRVA, proposes an award between $40,000.00 and $45,000.00. Resp. at 9-11. In support of his proposed award, Respondent distinguishes the cases cited by Petitioner and cites *Ramos* and *Mejias*, involving pain and suffering awards of $40,000.00 and $45,000.00, respectively.[8] *Id.* at *11-14.

To support this aspect of her damages request, Petitioner notes that she underwent a six month course of treatment involving seven visits to the Employee Health Center, three orthopedic appointments, 11 PT sessions, and a cortisone injection. Mot. at *14. Her treatment is thus like the petitioners in *Knauss* and *Johnson*, who treated for six months, including with PT and a cortisone injection. *Id.* Like the *Dagen* petitioner, she had one cortisone injection; however, Ms. Hurley attended more PT (11 sessions versus six in *Dagen*), and the *Dagen* petitioner did not consult an orthopedist. *Id.* Petitioner argues that petitioners with similar diagnoses and treatment have been awarded at least $63,000.00, and argues that the record in this case justifies an award of $68,000.00. *Id.* at *15.

Respondent argues that Petitioner's injury was "remarkably mild," noting that her symptoms resolved within several months of vaccination with conservative treatment and she had no pain at rest and full strength and ROM for almost the entirety of her injury. Resp. at *10. Her symptoms never impaired her ability to perform her job duties. *Id.* Her last PT session was less than two months after vaccination, and she had one steroid injection, but no MRI imaging and surgery was not recommended. *Id.* at *10-11. Respondent acknowledges that this case and *Russo* share similarities – 11-12 PT sessions, no MRI, and a steroid injection – but notes that the *Russo* petitioner's injury continued for two months longer than Ms. Hurley's. *Id.* at *11. The *Russo* petitioner rated her pain as seven to eight out of ten initially, while Ms. Hurley admitted that she usually had no pain at rest and her pain increased to eight out of ten only during certain motions, especially at night. *Id.*

The petitioner in *Johnson* had significant and immediate pain of seven to eight out of ten, compared to Ms. Hurley having no pain at rest. Resp. at *11. And the *Johnson* petitioner complained of shoulder pain for the next several years (although she stopped

---

[7] *Russo v. Sec'y of Health & Human Servs.*, No. 20-1491V, 2022 WL 4717927 (Fed. Cl. Spec. Mstr. Aug. 31, 2022); *Johnson v. Sec'y of Health & Human Servs.*, No.18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021); *Dagen v. Sec'y of Health & Human Servs.*, No.18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019); and *Knauss v. Sec'y of Health & Human Servs.*, No.16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018).

[8] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); *Mejias v. Sec'y of Health & Human Servs.*, No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021).

seeking treatment six months after vaccination), while Petitioner's PCP visits after the six-month mark contain no reference to ongoing shoulder pain. *Id.* at *11-12. Respondent argues this case is unlike *Dagen*, because the petitioner in that case described her shoulder pain at worst as ten out of ten and was unable to raise her arm for over a month, making it difficult to drive, get dressed, and sleep through the night. *Id.* at *12. In contrast, Ms. Hurley "had nearly full ROM and strength throughout the course of her injury." *Id.*

By contrast, Petitioner's "complete lack of pain at rest, short duration of treatment, and full strength and ROM throughout" make the awards in *Ramos* and *Mejias* appropriate benchmark awards for this case. Resp. at *12. Respondent acknowledges that the *Ramos* petitioner did not report his symptoms to medical personnel until several months after vaccination, but asserts that the *Ramos* petitioner's injury lasted approximately 13 months, more than twice as long as Ms. Hurley's injury. *Id.* The *Ramos* petitioner also did not receive a steroid injection, but rated his pain ten out of ten with activity and five out of ten at rest, compared to Ms. Hurley reporting that she usually had no pain at rest at her initial appointment and complaining of pain of eight out of ten during certain motions. *Id.* at *12-13.

In addition, Respondent argues, the petitioner in *Mejias* initially had fairly severe pain, and was unable to move his arm at his first appointment. Resp. at *13. At a follow up ten days after vaccination, the *Mejias* petitioner reported pain of three out of ten at that time and six out of ten with activity. *Id.* The *Mejias* petitioner did not participate in PT, but had an MRI with positive findings, suggesting a slightly higher award than appropriate for a case without such findings. *Id.* The *Mejias* petitioner's injury continued for approximately ten and a half months, though with an eight month gap in treatment. *Id.* Respondent thus argues that the overall course of petitioner's injury is "on par" with that of the petitioner in *Mejias*, warranting a comparable award. *Id.*

Petitioner replies that the *Ramos* petitioner did not seek medical treatment until four months after vaccination, and did not undergo any injections or diagnostic imaging. Reply at *2-3. The petitioner in *Mejias* did not undergo any PT or injections and, after seeing an orthopedist once, had an eight month gap in treatment before returning for two more orthopedic appointments. *Id.* at *3. Petitioner adds that her case is "more significant" than *Russo*, *Johnson*, and *Dagen*, and merits a higher award. *Id.*

### C. Appropriate Compensation for Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written

documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

I find that this case is most like *Johnson* and *Dagen*. Both Ms. Hurley and the *Johnson* and *Dagen* petitioners treated their injuries for six months, with each having one steroid injection and attending a moderate number of PT sessions (11 sessions in this case, six in *Johnson*, 16 in *Dagen*). *Johnson*, 2021 WL 836891, at *1-3; *Dagen*, 2019 WL 7187335, at *2-4. All three petitioners reported significant pain. *See Johnson*, 2021 WL 836891, at *1-2 (initially reporting pain levels of seven to eight out of ten, which later improved to two out of ten); *Dagen,* 2019 WL 7187335, at *2-4 ("[o]n the evening of the vaccines she was sore, but could not move her arm," and later rating her pain between two and four at best and nine and ten at worst). *Ramos* and *Mejias* are not comparable, however, in that both petitioners greatly delayed treatment or allowed gaps in treatment, neither had steroid injections, and the *Mejias* petitioner did not undergo any PT. *Ramos*, 2021 WL 688576 at *2-3, 5; *Mejias*, 2021 WL 5895622 at *3-4, 7.

At the same time, Ms. Hurley's injury is noteworthy for the fact that while she experienced significant pain, she reported *no* pain at rest. Ex. 4 at 3. There is a difference between an injury that results in constant pain and one that results in pain only with certain activities. While both types of injuries impact the life of the sufferer, an injury that does not cause pain at rest allows some respite and pain-free activities. I thus determine that this case warrants a lower award than that in *Johnson* and *Dagen*.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner's right shoulder injury meets the definition for a Table SIRVA, and that Petitioner is entitled to compensation in this case. Furthermore, I find that $60,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[9]**

**Therefore, I award Petitioner a lump sum payment of $60,000.00 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.